JOHN A. CARMAN
8064 Allison Ave,
Unit 577
La Mesa, C.A. 91944
(619) 609-1733
*Pro Se*

## UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| JOHN A. CARMAN,<br><br>                   Plaintiff,<br><br>v.<br><br>U.S. MERIT SYSTEMS PROTECTION BOARD; U.S. SOCIAL SECURITY ADMINISTRATION; DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES; THE OFFICE OF THE PRESIDENT OF THE UNITED STATES; THE CONGRESS OF THE UNITED STATES; THE EQUAL OPPORTUNITY COMMISSION; U.S. OFFICE OF SPECIAL COUNSEL; PETE R. FLORES, IN HIS OFFICIAL CAPACITY AS THE COMMISSIONER OF CUSTOMS; SCOTT BESSENT, IN HIS OFFICIAL CAPACITY AS SECRETARY OF TREASURY; and JOHN AND JANE DOES, 1-100 and ABC GOVERNMENT ENTITES, 1-100;<br><br>                  Defendants. | Civil Action No. 25-1120C _____<br><br>**COMPLAINT** |

Received - USCFC

JUL 0 1 2025

Plaintiff, JOHN CARMAN ("Plaintiff" or "Mr. Carman"), by way of Complaint against defendants, U.S. MERIT SYSTEMS PROTECTION BOARD; U.S. SOCIAL SECURITY ADMINISTRATION; DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES; and THE OFFICE OF THE PRESIDENT OF THE UNITED STATES; THE CONGRESS OF THE UNITED STATES; THE EQUAL OPPORTUNITY COMMISSION, U.S. OFFICE OF SPECIAL COUNSEL; CHARLES WINWOOD (PETE R. FLORES, IN HIS OFFICIAL CAPACITY As THE COMMISSIONER OF CUSTOMS), SCOTT BESSENT (IN HIS OFFICIAL CAPACITY AS SECRETARY OF TREASURY); and JOHN AND JANE DOES, 1-10 and ABC GOVERNMENT ENTITES, 1-10; ("Defendants"); states as follows:

## NATURE OF THE ACTION

1.      This is a civil action for injunctive and declaratory relief and damages in that Plaintiff was denied his rights under 15 U.S.C. § 2087, 5 U.S.C. § 1221, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq as amended by the Civil Rights Act of 1991, Pub. L. No. 102-166, the Civil Rights Act of 1871, as amended, 42 U.S.C. §1983, 42 U.S.C. §1985, 5 U.S.C. 1221, and the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

2.      All of the claims set forth in this Complaint are based on the unlawful treatment of Plaintiff by his employer, the United States Customs

Service ("Customs"), an agency under the auspices of the United States Department Of The Treasury, in addition to a whole host of other government agencies which have actively assisted Customs in its effort to silence the Plaintiff, or at the very least, acquiesced in their attacks.

3.      Plaintiff is suing in his individual capacity including, but not limited to, his status as "Whistle Blower" [5 U.S.C.A. 1221] and as an employee of the United States Customs Service. Plaintiff has been subjected to extreme discrimination in the terms and conditions of his employment, including but not limited to actual death threats and unlawful termination and to  retaliation by Customs employees and specific employees named herein, on the basis of his being a "Whistleblower". This discrimination and retaliation have been continuous and ongoing against Plaintiff during and subsequent to his employment separation from the U.S. Customs Service and in violation of a resignation agreement signed on or about March 1998, which has continued through the date of this First Amended Complaint to date.

## JURISDICTION AND VENUE

4.      This case arises under the United States Constitution and  5 U.S.C. § 1221, 15    U.S.C. § 2087; 42 U.S.C. §§ 1983, 1988. This Court has jurisdiction over Plaintiff's Federal claims pursuant to 28 U.S.C. § 1491 and

supplemental jurisdiction over any of Plaintiff's other claims, outside o pursuant to 28 U.S.C. § 1367. The declaratory and injunctive relief sought by Plaintiff is authorized by 28 U.S.C. §§ 2201, 2202, 42 U.S.C. § 1983 and Rule 57 of the Federal Rules of Civil Procedure.

5.      This Court is an appropriate venue for this cause of action pursuant to 5 U.S.C. § 1221, 15 U.S.C. § 2087; 42 U.S.C. §§ 1983, 1988. This Court has jurisdiction over Plaintiff's Federal claims pursuant to 28 U.S.C. § 1491 and supplemental jurisdiction over any of Plaintiff's other claims, outside o pursuant to 28 U.S.C. § 1367.

6.      This Court has the authority to award costs and fees under 42 U.S.C. § 1988.

## PARTIES

7.      Plaintiff is a citizen of the United States. He was, at all relevant times, a resident of La Mesa, California.

8.      Defendant, U.S. MERIT SYSTEMS PROTECTION BOARD, was at all times a United States Federal Government entity responsible for the adjudication of claims for federal employees.

9.      U.S. SOCIAL SECURITY ADMINISTRATION was at all times a United States Federal Government entity responsible for the administration of benefits accrued through the collection of wage earnings of Plaintiff over the course

of multiple decades.

10.    DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES; was at all times a United States Federal Government employee responsible for the fair and proper treatment of federal employees of the Executive Branch.

11.    THE OFFICE OF THE PRESIDENT OF THE UNITED STATES was at all times a United States Federal Government entity responsible for the fair and proper treatment of federal employees of the Executive Branch.

12.    THE CONGRESS OF THE UNITED STATES; was at all times a United States Federal Government entity responsible for passing federal law that must be followed by all branches of the United States Federal Government and ensuring that the other branches of government follow the laws passed by the United States Congress, including the Whistleblower Protection Act.

13.    THE EQUAL OPPORTUNITY COMMISSION was at all times a United States Federal Government entity responsible for the adjudication of claims for federal employees.

14.    U.S. OFFICE OF SPECIAL COUNSEL; CHARLES WINWOOD was at all times a United States Federal Government entity responsible for the adjudication of claims for federal employees.

15.    PETE R. FLORES, IN HIS OFFICIAL CAPACITY AS THE COMMISSIONER OF CUSTOMS, was at all times a United States Federal

Government entity responsible for the adjudication of claims for federal employees under the aegis of Customs and Border Patrol.

16.    SCOTT   BESSENT,   IN   HIS   OFFICIAL   CAPACITY   AS SECRETARY   OF   TREASURY   was   at   all   times   a   United   States   Federal Government entity responsible for the adjudication of claims for federal employees under the aegis of the Treasury Department; and

17.    JOHN AND JANE DOES, 1-10 and ABC GOVERNMENT ENTITES, 1-10; fictious defendants heretofore unknown at this time, but who may become apparent through the course of discovery of this matter.

## FACTUAL BACKGROUND

### THE UNITED STATES CUSTOMS SERVICE

18.    The United States Customs Service (Customs Service) is a branch of the United States Treasury Service and is charged with enforcing the laws of the United States with respect to the importation and exportation of unauthorized merchandise, including firearms, vehicles, narcotics, currency and other substances, as well as the prevention of the entry of illegal aliens, and entrance and/or exit of fugitives to or from the United States. Additionally, customs officers are charged with enforcing over forty other Federal Agencies' laws and regulations, including both Federal and State laws.

19.    The duties of the Customs Inspectors require the utmost integrity

6

and honesty in the face of necessary contacts with felons, smugglers, money launderers and fugitives. The Customs Inspectors provide the first front lines of defense on the borders of the United States. Huge amounts of money are often at stake and physical violence is common. Death threats, particularly in this case, are also common. News reports indicate that major Mexican drug cartels routinely payoff large amounts of bribes for cars, trucks, tankers, sea containers and other conveyances carrying large amounts of narcotics including but not limited to cocaine across the United States borders, ranging from $50,000 for a car to $250,000 for an 18-wheeler.

*AGENCY CORRUPTION*

20.    Plaintiff is informed and believes and based thereon alleges that, because of the financial incentives at stake, corruption within the Customs Service, at least in San Diego, was and is rampant.

21.    Plaintiff is informed and highly trained and experienced, believes and based thereon alleges that U.S. Customs personnel, including high-ranking personnel, have routinely accepted bribes and engaged in other unethical and illegal activities, including falsifying reports, deleting suspect information from the Customs Intelligence Reporting Computer Systems(TECSII), aiding and abetting in the facilitating and importing narcotics and dangerous drugs as well as illegal aliens

into the United States.

22.    In one case alone 8,500 pounds of cocaine were involved. In another case the entry into the United States of one hundred and sixty-seven unauthorized persons was facilitated. Other cases involved converting seized monies and tampering with export shipments. High ranking officials discouraged line inspectors from searching suspected trucks, ignoring, or destroying intelligence reports, providing preferential treatment to companies with ties to drug trafficking, and providing what agency personnel refer to as "Bingo Cards" or "Get out of Jail Free Cards" to drug dealers and other unauthorized persons. Said cards, when presented by the holder, entitle the recipient to "preferential treatment" at the United States borders.

23.    Plaintiff is informed and believes and based thereon alleges that Customs Inspectors who have complained about corruption or unlawful practices are harassed, retaliated against, demoted, transferred, discredited, dismissed, and can expect to receive numerous death threats. Few Inspectors are willing to reveal their names as "whistleblowers" for fear of reprisals against them, all of this in violation of public policy and both state and federal law. It is important to note that former Customs internal affairs SAIC Agent Miguel Contreras has confirmed and verified that all of Plaintiff's allegations regarding Customs were "100% correct."

24.    Plaintiff has had numerous death threats is informed and believes and

based thereon alleges that anyone who stands up and speaks out to identify unlawful conduct in the agency as is required by his law enforcement position and Oath of office, is labeled a troublemaker and his or her statements are dismissed as those of a disgruntled employee. Plaintiff was specifically ordered by his superiors(John "Jack" Maryon) not to speak with other "whistleblowers," which is contrary to law and normal procedures for conducting law enforcement procedures. Plaintiff was also asked by Customs Supervisor John "Jack" Maryon to remove certain suspects' information(Jorge Hank- Rhon) out of the Customs TECS II computer lookout systems due to alleged influence from Mexican Cartel related suspects as they were very close to U.S. Customs District Director Alan J Rappoport, Jerry B Martin(now deceased) and many others in management.

25.    Plaintiff who has  received multiple death threats and is informed and believes and based thereon alleges that, the agency has intentionally failed and refuses and continues to fail and refuse to take the affirmative steps necessary to thoroughly investigate and prosecute the offenders in violation of 18 U.S.C. § 4. 26. Plaintiff is informed and believes and based thereon alleges that, the agency has intentionally failed and refuses and continues to fail and refuse to take the affirmative steps necessary to thoroughly investigate and prosecute the offenders.

26.    Plaintiff is informed and believes and based thereon he alleges that Customs lacks an independent investigative unit to investigate wrongdoing within

the agency. Plaintiff's complaints to Internal Affairs were ignored and the only significant action taken by the department was to conduct "damage control" by "plausible deniability" and to cause the termination of employment and discredit employees, and specifically the Plaintiff, who address this corruption.

## MEDIA COVERAGE AND SENATORIAL INQUIRIES

27.    Plaintiff is informed and believes and based thereon alleges that the rampant corruption within the Customs Service, at least in San Diego, has been the subject of media attention as well as concerns raised by persons such as United States Senator Diane Feinstein. For example, in April 1997, CBS "60 Minutes" program ran a story about known Mexican drug smugglers knowingly being permitted to enter into the United States without inspection. The footage demonstrated two tanker trucks owned by California Gas Transport coming across the Otay Mesa Port of Entry entirely free from inspection. Customs' own intelligence reports allegedly indicated at the time that California Gas Transport is connected to members of the Mexican-based Zaragosa Fuentes family who are suspected of heavy narcotics smuggling and money laundering.

28.    On April 25, 1997, Senator Feinstein wrote to Treasury Secretary Robert Rubin, "Based on the information in Customs' own intelligence report just two months earlier, how is it possible that California Gas Transport could possibly be considered a "minimum threat?" Senator Feinstein also brought to the attention of

Secretary Rubin that Customs Inspectors refuse to come forward because they "know what happens to whistle blowers." The above-described California Gas Transport trucks, which were on at least two occasions the subject of a strong alert by Customs K-9 teams, were ordered "released" by Customs Supervisor, Arthur D. Gilbert, one of the key people reported by Plaintiff to Internal Affairs. Subsequently one of the trucks was discovered to contain 8,500 pounds of cocaine. Subsequently one of the trucks was discovered to contain 8,500 pounds of cocaine. It is important to note that then Supervisor Arthur D Gilbert allowed the driver to walk back to Mexico at Otay Mesa and later turned up dead according to reports.

29.    The CBS story recounted an incident on October 3, 1990, wherein San Diego Supervisor Gilbert tried everything in his power to prevent a hydro propane tanker carrying four tons of cocaine from being searched, even after a K-9 alert on the tanker. The driver of that tanker was allowed to casually walk back across the border to Mexico.

30.    Another example of the gravity of the problem, left unchecked, was 207 telephone calls, within a two-week period, allegedly originating from Supervisor Gilbert's residence to a known money launderer, Samuel Gomez Chaidez. Other than the telephone investigation, no charges were ever brought or further investigation mentioned. Other similar incidents are too numerous to describe herein.

31.    Senator Feinstein copied her correspondence of April 24, 1997

detailing her grave concerns to President Clinton, Janet Reno, Attorney General, Erskine Bowles, Chief of Staff to the President and Raymond W. Kelly, Under Secretary of Treasury for Enforcement, but no discernable action was taken to remedy Plaintiff's concerns, or those reiterated by Senator Feinstein.

32.     In an article in the San Diego Union-Tribune published on October 1, 1995, U.S. Customs Service Commissioner George Weise, who quit his position in April, 2000, in part because of the unceasing criticism of corruption in San Diego, was quoted as having given "personal assurances that no employee with information about corruption would be penalized for coming forward." Further, Commissioner Weise confirmed on February 21, 1995, the right of Customs Inspectors to speak with news agencies regarding perceptions of misconduct or mismanagement. These representations and assurances were false as the prevailing attitude and actions taken by high-ranking Customs officials did not encourage such disclosures but, in fact, discouraged them as acts of retaliation were natural consequences taken against any employee revealing said corruption. It is important to note that Mr. Carman personally asked Commissioner George J Weise about the memo and showed him a copy and Commissioner Weise confirmed it was real, and no retribution would occur when reporting illegal acts or corruption.

33.     This same October 1, 1995, news article quoted Plaintiff as indicating that retaliation for reporting is rampant and that corruption is clearly

present in San Diego. On September 21, 1996, Plaintiff provided information to "E1 Universal," a Mexican newspaper, wherein he again publicly criticized the San Diego branch of U.S. Customs.

34.      Since Plaintiff began reporting to his superiors in Washington his beliefs about corruption in San Diego, Plaintiff has been repeatedly retaliated against. While he was an employee he was refused promotions, to which he was entitled, has had his performance evaluations changed, has had test scores reduced by those very persons who ordered him to attend an Import Academy, and was further told that he was required to "pass" the training provided there. In further retaliation Plaintiff was stripped of his gun and badge and told not to use the Treasury Enforcement Computer System (TECS). Because Plaintiff believed that he was being "set up" for failure and based on his physician's directive, Plaintiff declined to attend the Import Specialist Academy.

## _CONTINOUS DENIAL OF BASIC BENEFITS AND SOCIAL SECURITY FUNDS_

35.      Since being invalidly discharged and then set up by the group in the government Mr. Carman attempted to disclose to the proper authorities illegal acts and signs of corruption, Plaintiff has been continuously denied benefits he accrued and is deserving of during his service as both a Secret Service Officer and Customs Inspector A Salary, promotions and yearly increases with quality step increases and damages.

36.    Starting in 1985 Plaintiff started filing grievances with the Customs Internal Affairs for all the death threats he was receiving for making drug seizures. Plaintiff attempted to go to the Office of the Inspector General for Customs and the Commission of Customs; this was a waste of time. After exhausting his inter-agency administrative reporting requirements, and inquiring with the then George J. Weiss, who stated to Plaintiff, that after having done everything possible inside of Customs, that he could go outside Customs to seek redress of his grievances. Then Plaintiff went to the Department of the Justice, Federal Bureau of Investigation, and attempted to discuss his issues. None of this bore any fruit.

37.    After resigning from Customs, under duress and threat of physical violence, Plaintiff resigned in 1998. Around 2010 Plaintiff started to notice that the Social Security Administration was not including dates of service with Customs that was clearly erroneous, which immediately made the Plaintiff realize that this was likely another retaliation for his whistleblower activity, but it is uncertain that this was intentional at this time. At this this point, the Merit Systems

38.    Protection Board, and other administrative agencies for the proper payment of benefits owed by the U.S. Government. Upon each application Plaintiff is denied but is never given a valid response as to how years of government service can be wiped out. The only logical response is that the individuals and groups Plaintiff could expose with the information he has as a whistleblower, conspired

14

together to deny Plaintiff a basic living income. This has become even more prescient and the focus of Plaintiff's efforts as he is advancing in age and is suffering from a number of injuries and health problems.

## FACTS COMMON TO ALL CLAIMS

39.    Plaintiff has a significant history in law enforcement. On or about January 1, 1983, he worked for U.S. Mint Police after being reinstated and then after ten months transferred over to U.S. Customs on or about October 30, 1983, to San Diego District. Previously United States Secret Service September 3, 1974, through October 31, 1977.

40.    Beginning in the year 1989 and up until he was fired on June 19, 1997, Plaintiff held the position of Senior Customs Inspector together with the responsibility of the position and, subsequently under protest, Import Specialist GS-1890-11. Plaintiff accepted, under protest, the Import Specialist position as a result of a medical condition arising from the inhalation of automobile fumes at the Otay Mesa Port of Entry, and as a result of pressure from his superiors.

41.    Beginning on or about June 1995 Plaintiff timely filed formal complaints with the U.S. Treasury Department alleging discrimination based on being a "Whistle Blower" [5 U.S.C.A.1221] and retaliation for his involvement in making "confidential disclosures" which were subsequently improperly disclosed to members of high-ranking officials that were in fact the subject of the "confidential

disclosures" and he made further disclosures relating to officials accepting money and other illegal activities.

42.    The same "persons" that were the subject of the confidential disclosures, conspired [42 U.S.C.1985] to have Plaintiff removed from his position creating a "hostile work environment" and subsequently Plaintiff was fired/ "forced to resign". Pursuant to the Civil Rights Act of 1964 §717(c), as amended, 42 U. S. C. 52000e-16 (c), jurisdiction for de novo review of Plaintiff's Title VII action exists.

43.    This discrimination has included, but is not limited to, unequal treatment in promotions and work assignments, creation of a hostile work environment, and unlawful retaliation for the filing of "Whistleblower" [5 U.S.C.A. 1221] and EEO complaints.

44.    On June 19, 1997, after Plaintiff gave several radio interviews about the corruption at Customs, and having, on June 5, 1997, reported Port Director Alan J. Rappoport to Commissioner Weise for "serious mismanagement, and/or illegal conduct, Plaintiff was wrongfully terminated, in violation of California's public policy, and in violation of the implied covenant of good faith and fair dealing, on the pretext that he failed to attend the Import Specialist Academy training which had been previously ordered. This also followed a demand made on June 6, 1997, by Stephanie Castro, on behalf of Port Director Henderson, to divulge the contents of

Plaintiff's confidential report to Commissioner Weise in Washington D.C. which was sent the day prior on June 5, 1997. Plaintiff declined to divulge the protected material, notwithstanding significant and unwarranted pressure to do so.

45.    In 1998 when Plaintiff applied for a concealed weapon permit from the State of California he was told that he qualified and all that was needed for him to secure that license was copies of his personnel files from United States Customs relating to his employment which they had requested.

46.    Plaintiff continued to inquire of the state as to when his permit would be granted but he continuously received the same response that their request to Customs had not been responded to and without those files he could not get a permit. Upon information and belief, Plaintiff alleges that over the past three years Defendants Camacho and others have deliberately refused to supply California with the requested records as a further act of unlawful retaliation against Plaintiff designed to intentionally deprive him of his constitutional rights.

47.    It is important to note that Rudy M. Camacho was the former District Director during the time of Plaintiff's permit application and was the subject of an internal affairs investigation. Interestingly, Rudy Camacho's attorney called Plaintiff to negotiate with him about the knowledge he had about Rudy Camacho. It must be noted that Plaintiff was not given any consideration, so he refused to co-operate. At

the time, Plaintiff was on Administrative or injury leave , sometime in 1995. It was around this time that Plaintiff's Personnel File, his 7B Folder, went missing which had all of his commendations in it. This file has never been found since this time.

48.    These retaliatory actions frustrated Plaintiff's efforts to secure a concealed weapons permit and also violated Defendants' explicit written, and verbal promises to the contrary regarding Plaintiff's application for a concealed weapons permit.

49.    Plaintiff is informed and believes and on that basis alleges that, on or about June 16, 1999 United States Customs Officers without basis and/or probable cause, retaliated further against Plaintiff by ordering and directing state law enforcement officers of the La Mesa Police Department, Defendants herein, to stop Plaintiff's vehicle and detain and search him and in the presence of his 13 year old daughter whom was a recent rape victim and was in Mr. Carman's protective custody, and searched his vehicle and questioned Mr. Carman's 13 year old daughter which they did without probable cause violating Plaintiff's right under the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

50.    Police Officers, David Bond, T. Burgess, B. Stoney, M. Chambers, and Doe 1, an unknown Police Officer of the City of La Mesa, without probable cause, detained and subjected the Plaintiff to harassment and arrest, at the direction of Defendants Alicia Fuentes, Jeanne M. Daumen, Tom P. Rybczyk, Russell F.

Hixon, David C. Wales and at the direction of Rudy M. Camacho, all agents of the U.S. Customs Service and Raymond W. Kelly, as retaliation and intimidation by federal officers and state officers against the Public Policy of protecting "Whistleblowers". Each conspired with the other to violate the rights of the Plaintiff through force and fear under the color of law.

51.    Plaintiff was prosecuted and prevailed in the motion stage wherein a San Diego County Superior Court Judge found that there was no probable cause for the stopping of the Plaintiff. At that hearing the state officer admitted that the "pretextual stop" was directed by Defendants, U.S. Customs Officers. United States Customs Officers, together with state law enforcement officers, identified herein violated the Plaintiff's right to be free from harassment, and illegal use of Law Enforcement tactics to threaten, and intimidate and harass Plaintiff.

52.    Defendants , the state law enforcement officers identified herein, admitted that they were coaxed and directed by the Defendants Alicia Fuentes, Jeanne M. Daumen, Tom P. Rybczyk, Russell F. Hixon, David C. Wales and at the direction of Rudy M. Camacho, and Does 1 through 15, and agents of the U.S. Customs Service and Raymond W. Kelly to violate the rights of the Plaintiff under the color of law, because of the "Whistleblower" status and to harass the Plaintiff and intimidate and threaten him under the color of law.

53.     In addition to the above assertions by Plaintiff, it must be noted that additional specific threats and interference were received consistently by Plaintiff from District Director John Heinrich in Long Beach who Plaintiff reported numerous times regarding an Overflight List of 167 illegal Aliens from Mexico who had apparently paid over $250,000 for these Mexican nationals who did NOT have passports or entry documents. Plaintiff verified through Immigration sources with the names and DOBs on this list which is now a public record. Plaintiff verified the money thru a relative Chris Gerner, who Plaintiff, did an interview with and did NOT realize Gerner's sister was engaged to be married to John Heinrich, and she had deposited over $250,000 to their account and she also worked at the Long Beach Customs office. Chris Gerner received numerous threats NOT to talk to John Carman or to interview Mr. Carman as he would suffer and be homeless if he did. That was when Gerner indicated he had been threatened by John W Heinrich and later died of a heart attack.

54.     Starting in 1985 Plaintiff made continuing complaints to the EEOC and MSPB.

55.     From 2010 to the present various pronouncements were made and at certain times hearings were held to ascertain Plaintiff's access to all of his retirement benefits. Sometime in 2010, it became known to Plaintiff that fifteen

years had been wiped off his record without any explanation.

56.     Since that time, Plaintiff has been continuously filing appeals and performing whatever administrative remedies he could to preserve his rights and have his claims be heard by the U.S. Government. After years and years of this menagerie of administrative courts and continuing tactics of the U.S. Government to deny Plaintiff of his retirement funds and other benefits, Plaintiff now files this Complaint to get redress of his many grievances.

57.     In addition to continuously exercising these administrative remedies at every turn, Plaintiff has continuously reached out to numerous government agencies in the executive branch, as well as numerous congressional leaders, congressmen and women, and even the office of the president of the United States seeking redress of his longstanding grievances and asking for their support for the attacks he suffered as a result of his acts of integrity and transparency.

58.     No matter who he contacted, every plea by Plaintiff for help and protection was ignored by those he sought out. Each time, he would disclose his ordeal to these government officials, he would detail the crimes and other violations of federal law he witnessed that when he reported same, he was targeted for reprisal and destruction of his professional reputation. Each time, all of the various officials he disclosed his ordeal to, ignored clear evidence of federal crimes and took no action,

and allowed Plaintiff to continue to be attacked and harassed, thus acquiescing and acting as accomplices to the violation of Plaintiff's rights as a citizen of the U.S. and as a whistleblower.

59.      Over and over again, Plaintiff has been appealing the decisions of the various administrative courts in a never-ending cycle that has landed the Plaintiff with a complete denial of his benefits. Through this absurd and humiliating process, Plaintiff discovered, somewhere along the line, that fifteen (15) years have been wiped away from his service record with no explanation given on how that could even be possible. This discrepancy has never been explained by the Social Security Administration, and so a review of all their decisions, records, etc. as their decision to continue to deny full payment of benefits is without proper basis.

60.      Another fact that is important to note, that has caused Plaintiff difficulties in addressing the multiple injustices and reprisals, is that due to the stress of all these events, as well as aspects of the reprisals, have had a profound impact on Plaintiff's health and economic wellbeing, which has hampered his ability to fight these illicit actions by corrupt government officials. Even still, Plaintiff has been filing appeals consistently with all the appropriate administrative courts who just keep recycling the substantive aspects of Plaintiff's claim over and over again. This must end so as to give closure to Plaintiff, who should be enjoying his retirement after decades of loyal government service.

61.     In addition, Plaintiff continues to reach out to everyone from the President of the United States, down to his local congressional representatives, and all of his pleas for assistance and for action to be taken regarding the numerous crimes he witnessed have fallen on deaf or corrupt ears. Meanwhile, Plaintiff is suffering for showing the courage to try to expose corruption in the Customs Bureau. As a result, this Complaint was necessary to rectify same.

## COUNTS

## FIRST COUNT

### WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY
### ALL FEDERAL DEFENDANTS

62.     Plaintiff incorporates by reference the allegations stated in paragraphs 1 through 61 inclusive as though fully set forth herein.

63.     Defendants terminated Plaintiff from his employment with Customs in retaliation for Plaintiff having reported corruption and unlawful actions committed by certain Customs personnel.

64.     Defendants' termination of Plaintiff's employment was wrongful and in violation

of California public policy which protects whistleblowers from employment termination in retaliation for reporting activities which are believed to be unlawful.

65.     As a direct and proximate result of this wrongful termination Plaintiff has suffered emotional distress, mental anguish, loss of enjoyment of life,

loss of employment, income and benefits including substantial retirement benefits.

## SECOND COUNT

### VIOLATIONS OF THE WHISTLEBLOWER PROTECTION ACT (5 U.S.C. § 1221) ALL FEDERAL DEFENDANTS

66.     Plaintiff incorporates by reference the allegations stated in paragraphs 1 through 65 inclusive as though fully set forth herein.

67.     For many years, Plaintiff has brought to the attention of his superiors at Customs, including the Office of Internal Affairs, the San Diego Port Director, the Office of Special Counsel in Washington D.C., and others responsible for the investigating and prosecuting acts of corruption those wrongful, unlawful and corrupt actions that he observed being committed by high-ranking customs officials.

68.     In retaliation for reporting these corrupt acts, Plaintiff was retaliated against and discriminated against by being transferred, receiving poor performance evaluations and disciplinary actions and by being terminated from his employment.

69.     Additional retaliatory acts against him continued after his employment including the above alleged failure to supply California with his records and the unlawful stop, search, seizure, and detention of Plaintiff.

70.     All of these retaliatory acts constitute violations of the Whistleblower Protection Act (5 U.S.C. 1221) for which the Defendants are liable.

71.      As a direct and proximate result of Defendants' actions in violation of 5 U.S.C. 1221 Plaintiff has suffered emotional distress, mental anguish, loss of enjoyment of life, loss of employment, salary and benefits including retirement benefits.

## THIRD COUNT

### VIOLATIONS OF 42 U.S.C. § 1983
### ALL FEDERAL GOVERNMENT DEFENDANTS

72.      Plaintiff incorporates by reference the allegations stated in paragraphs 1 through 71 inclusive as though fully set forth herein.

73.      Defendants, who were responsible for the fair adjudication of Plaintiff's grievances or had supervisory capacity over the various agencies that had direct responsibility for the employment and other concerns of Plaintiff in his capacity as a customs agent. The failures of the agencies and other individuals to properly field reports by Plaintiff regarding the retaliation and to take the proper actions to protect Plaintiff, a whistleblower, constituted a violation of Plaintiff's civil rights.

74.      The acts and conduct of the individual Defendants as alleged above, constitute a violation of Plaintiff's rights protected by the United States Constitution to wit, the 4th, 5th, and 14th Amendments thereof. As a proximate, direct, and indirect result of the individual Defendants' conduct said individuals are liable for

Plaintiff's injuries, and damages alleged and described herein.

75.      In depriving Plaintiff of his protected Constitutional Rights and privileges, under the law of the State of California, and the United States, the individual Defendants were guilty of malice, oppression and willful disregard for the rights of Plaintiff in that Defendants acted with reckless indifference and did cause harm and injuries to Plaintiff.

## FOURTH COUNT

### REVIEW OF THE DECISIONS OF THE SOCIAL SECURITY ADMINISTRATION'S DECISIONS REGARDING PLAINTIFF PURSUANT TO 42 U.S.C. § 405(g)

76.      Plaintiff incorporates by reference the allegations stated in paragraphs 1 through 75 inclusive as though fully set forth herein.

77.      Defendant Social Security Administration, who were responsible for paying Plaintiff amounts owed for certain years of government service have refused to do so, citing a calculation of benefits which is missing fifteen years of work and contribution by Plaintiff.

78.      The acts and conduct of the individual Defendants as alleged above, constitute a violation of the Social Security Act and may well be violative of the U.S. Whistleblower Act.

79.      In depriving Plaintiff of his protected rights and privileges, under

the Social Security Act. Defendant Social Security Administration acted with reckless indifference and did cause harm and injuries to Plaintiff. As of today, over $250,000 in back payments by the Social Security Administration are still owed to Plaintiff.

## FOURTH COUNT

### VIOLATION OF GOOD FAITH AND FAIR DEALING ALL FEDERAL DEFENDANTS

80.     Plaintiff incorporates by reference the allegations stated in paragraphs 1 through 79 inclusive as though fully set forth herein.

81.     At all pertinent times herein, there existed an implied covenant of good faith and fair dealing inherent in Plaintiff's employment contract such that his employer was at all times required to treat Plaintiff with fairness. Such covenant is implied as a matter of law.

82.     Defendants' termination of Plaintiff's employment was in violation of this implied covenant of good faith and fair dealing for which Defendants are liable.

83.     As a direct and proximate result of Defendants' violation of this covenant Plaintiff has suffered emotional distress, mental anguish, loss of enjoyment of life, loss of employment, income and benefits including retirement benefits.

## FIFTH COUNT

NEGLIGENCE
DEFENDANTS COMMISSIONER OF CUSTOMS AND SECRETARY OF
TREASURY

84.     Plaintiff incorporates by reference the allegations stated in paragraphs 1 through 83 inclusive as though fully set forth herein.

85.     As the head of their individual agencies the Secretary of Treasury and Commissioner of Customs owed a duty to its employees, including Plaintiff, to exercise reasonable care to protect them from unlawful and retaliatory actions taken against them by other employees and supervisors.

86.     These Defendants breached that duty owed to Plaintiff by not exercising diligent care to ensure such actions did not occur.

87.     As a direct and proximate result of that breach of duty Plaintiff was retaliated against and wrongfully terminated for which these Defendants are liable.

88.     As a direct and proximate result of these Defendants negligence Plaintiff has suffered, emotional distress, loss of enjoyment of life, loss of employment, loss of salary and benefits and loss of retirement benefits.

WHEREFORE, Plaintiff prays for relief as follows:

(a)     Judgment against Defendants and each of them on each cause of action for compensatory damages, including back pay and front

28

pay, according to proof;

(b)     Punitive and exemplary damages against each of the federal Defendants on each of the causes of actions brought against them;

(c)     Reinstatement of Plaintiff to the federal governmental employment position, salary, and benefits, including retirement and pension benefits, that he would have had with appropriate promotions had he not been wrongfully terminated from his position;

(d)     An Order enjoining Defendants from any further retaliation and/or discrimination against Plaintiff;

(e)     An Order requiring that the Department of Customs release the requested employee records of Plaintiff to the State of California in relation to his application for a permit to carry a concealed weapon;

(f)     An Order that Defendants pay Plaintiff's attorney's fees and costs; and

(g)     Such other relief that the Court deems appropriate and equitable.

DATED this Friday, June 13, 2025

JOHN A. CARMAN, *pro se*
8064 Allison Ave,
Unit 577 La Mesa, C.A. 91944
(619) 609-1733